Ralph S. MAJOR, Jr., d/b/a Major & Associates, Plaintiff,

v.

ORTHOPEDIC EQUIPMENT COMPANY, INC., an Indiana Corporation, and Frank I. Saemann, Defendants.

Civ. A. No. 320–72–R.

United States District Court,
E. D. Virginia,
Richmond Division.

March 19, 1976.

Lewis T. Booker, Hunton & Williams, Thomas G. Slater, Jr., R. Kenneth Wheeler, Waller H. Horsley, Richmond, Va., for plaintiff.

Henry T. Wickham, Andrew J. Ellis, Richmond, Va., Stanley E. Pequignot, Rockhill, Kennedy, Pinnick, Sand & Bent, Warsaw, Ind., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, Ralph S. Major, Jr., doing business as Major & Associates, (hereinafter Major), brings this action for injunctive and monetary relief against Orthopedic Equipment Company, Inc. (hereinafter Orthopedic), an Indiana corporation, and Frank I. Saemann, a resident of the State of Indiana for alleged violations of a distributorship agreement. Jurisdiction is conferred on the Court by virtue of Title 28 U.S.C. § 1332, as there exists diversity of citizenship between the plaintiff and both defendants, and the amount in controversy exceeds the sum of $10,000 exclusive of interest and costs.

The matter initially came before the Court on plaintiff's motion for a temporary restraining order, which was entered by the Court under date of May 4, 1972. The temporary restraining order was replaced on May 25, 1972 by a stipulated preliminary injunction order pending a final hearing and determination of the cause by the Court. The Court on February 20 and 21, 1973 heard evidence on the question of the length of time of the contract entered into between the parties; and the Court ruled from the bench that the contract was intended by the parties to exist for a period of thirty years. Thereafter a settlement agreement was entered into by the parties. As part of the settlement, the Court on February 21, 1973 entered, from the bench, a permanent injunction prohibiting the defendants from making any sales of their equipment in the plaintiff's distributorship territory without paying the plaintiff the commission as provided in the distributorship agreement. A

stipulated permanent injunction order was entered by the Court on May 15, 1973 to affirm and clarify the February 21 agreement. The plaintiff later filed a motion for the defendants to show cause on why they should not be held to be in contempt of the Court's order, and said motion was heard by the Court on May 25 and June 14, 1973. The defendants were then adjudged to be in contempt, and payment of the $10,000 fine then imposed was stayed pending a finding of continuing violations at a later date. On June 11, 1974, the defendants filed a motion for clarification of the Court's injunctive order. The motion was fully briefed by both sides and heard by the Court; the Court now deems the matter ripe for determination. The facts as the Court finds them are as follows:

On September 15, 1969, plaintiff and defendant Orthopedic entered into a distributorship agreement. Paragraph 7 of the agreement relating to the amount of commissions provides:

Amount of Commissions: Commission shall be paid by the Company to the Distributor in accordance with Exhibit A, as aforesaid, but subject to the following:

(a) In the event new items of merchandise are added, Company and Distributor shall agree upon the rate of commission to be paid to Distributor prior to marketing of said new product.

(b) The list prices of Company merchandise are subject to change at all times by the Company upon reasonable notice to the Distributor.

(c) It is recognized that, from time to time, it may become economically unfeasible for the Company to maintain the commission schedule in effect at the inception of this agreement with respect to any given item due to circumstances beyond the control of the Company. In such cases, Company and Distributor agreed to negotiate a new commission rate with respect to such item which rate shall be determined by acceptable accounting procedures and which rate shall also represent a fair rate of return to both the Company and Distributor.

Paragraph 15 of the agreement provides:

Best Efforts: During the term of this agreement and any renewal period, Distributor shall exert his best effort to sell and promote Company's products. *At no time shall Distributor sell or promote, directly or indirectly, any items of merchandise normally sold in the medical and hospital field which are not invoiced by the Company.* It is understood that Distributor's primary obligation is to sell and promote Company products but nothing contained herein, however, is intended to prohibit Distributor, as an independent contractor, from engaging in fields of endeavor other than the sales of products normally sold in the hospital and medical fields. (Emphasis added.)

Subsequent to the parties entering into the agreement, Major sold items of orthopedic equipment which were not manufactured or merchandised by Orthopedic. Major also sold non-orthopedic equipment in the hospital and medical field which were not then and never have been manufactured by Orthopedic.

In dispute are two issues: (1) whether Major, in selling items not manufactured or merchandised by Orthopedic, violated the contract conditions, and (2) what commissions Major is entitled to receive from Orthopedic on all old products, i. e., those carried by Orthopedic prior to June 1, 1973 and marketed by Major between June 1, 1973 and December 31, 1974. The commissions Orthopedic is obligated to pay Major on new products, which were first marketed by Orthopedic after June 1, 1973 and sold by Major during the period between June 1, 1973 to December 31, 1974, and the commissions presently due under the agreement have been submitted to binding arbitration between the parties, by virtue of the consent order of January 23, 1975.

The explicit language of paragraph 15 of the agreement, as heretofore noted, prohibits Major, as a distributor, from selling competitive as well as non-com-

petitive items of merchandise sold in the hospital and medical fields. The distributor may sell, as an independent contractor, other product lines only if those lines are not normally sold in the hospital and medical fields. Such was the interpretation of the persons representing the plaintiff's interest in the contract drafting process and it is further borne out by a purview of the preliminary drafts of the document. The plaintiff asserts, however, that his sales of other non-competitive manufacturers' products in the hospital and medical field were done with the assent and knowledge of Orthopedic's president and other officers and that said assent effectuated an oral modification of the contract's provisions. Accordingly, it is asserted that Major's reliance upon the oral modification in changing his position to conform with its more flexible constraints, estops Orthopedic from enforcing the agreement's original conditions. See *Employers Commercial Union Insurance Company of America v. Great American Insurance Company, et al.*, 214 Va. 410, 200 S.E.2d 560, 562–64 (1973); *John Hancock Mutual Life Insurance Company v. Virginia National Bank*, 212 Va. 31, 181 S.E.2d 618 (1971); *Thrasher v. Thrasher*, 210 Va. 624, 172 S.E.2d 771, 773–74 (1970). In light of the Court's ordering from the bench on June 13, 1973 that the parties "stick to what the situation was as of the time of the injunction unless you can agree to change it," (Tr. 21, 22, 39) any modification of the contract effective prior to May 13, 1973 became part of the Court's injunction.

■ Orthopedic had, prior to May 13, 1973, interpreted the agreement in a manner contra of its express language. However, its interpretation has consistently reflected a policy narrower than that asserted by Major. Throughout its relationship with Major under the agreement, Orthopedic has consistently interpreted paragraph 15 as prohibiting the distributor from *representing* other companies who sold products in the hospital and medical field. For example, several orthopedic distributors have been terminated pursuant to the contract for representing other product lines. However, Orthopedic has, as a sound business practice, always allowed, in spite of the express language in the agreement to the contra,[1] distributors to supply customers with any product they request, even if Orthopedic manufactures a competing product, in order to preserve their client accounts. The policy was described by one of the distributors, who was also a primary negotiator of the contract, in the following manner:

Q: Right after you started with Orthopedic, did you have occasion to inventory some of your old Richards' [a company competing with Orthopedic in the medical field] customers such as hospital and doctors, and take inventory of their orthopedic products?

A: That was common, yes sir. Did it all the time in office calls.

Q: Did Orthopedic have a full line of products as did Richards?

A: No.

Q: What would you do when you were taking inventory of one of your old customers and they needed a certain product that Orthopedic did not carry?

A: Well, depending upon the account and the latitude it varied. If the purchasing department and the surgical supervisor gave you a carte blanche, control of their account, I would take an inventory, and whatever their requirements were I would supply with Orthopedic equipment wherever I could, and I would handle the remainder of ordering from the choice of suppliers. Or if I had privileges, when I would take inventory, I

---

1. Paragraph 15 of the agreement provides that "at *no* time shall Distributor *sell or promote* . . . any items of merchandise normally sold in the medical and hospital field which are not invoiced by the Company." (Emphasis added). Orthopedic construes "sell or promote" to mean "represent" or "act as a distributor of."

would write down the catalogue number and list the item, take it down to the purchasing department and let them write the order for Richards, or whoever, just to maintain control of the inventory. I didn't want a representative from Richards coming in to write the order, or Zimmer or anyone else. [Deposition of Pat Conroy, December 4, 1972, pages 87–88].

The distinction between Major's interpretation and Orthopedic's is the distinction between a sale which arises because the distributor has become an agent for another manufacturer, and a sale which arises because the distributor is attempting to satisfy the demands of his regular customers, either by completing their inventory or by supplying their request for a particular item with merchandise sold by manufacturers other than Orthopedic.

Furthermore, the evidence indicates that in those instances in which an Orthopedic distributor must order from competing or non-competing product lines for customers, the company expects the distributor to have the customer billed through Orthopedic. See Deposition of Evan Werling, December 29, 1972, pages 320–21; Deposition of Pat Conroy, December 4, 1972, pages 34–35, 54–56, 66–67.

Major has exceeded Orthopedic's interpretation of the agreement on several instances. For a period of time preceding September, 1971, Major represented Xomed Company, selling products that were non-competitive with Orthopedic's but in the medical and hospital field; in late 1973 and in 1974 Major represented Sorenson Company and Diffusion Sales Company, manufacturers who sell products in the hospital and medical fields. On October 14, 1970, Major was given a termination notice because of his representation of Xomed Company, and said notice was later withdrawn on assurances from Major that he would drop his Xomed representation. Major continued to represent Xomed for a year subsequent to that communication.[2] In the fall of 1973, Major requested of Orthopedic that it permit him to represent the Sorenson Company, and this request was denied. Despite the denial, Major became a Sorenson distributor. In 1974 Major became a distributor for Diffusion Sales although he never requested permission from or advised Orthopedic of his relationship with that company.

In response, however, to Orthopedic's accusation that the evidence demonstrates that Major has unilaterally taken action which is in violation of the stipulation entered into by the parties, paragraph 15 of the contract as interpreted by the parties and the Court's injunctive orders, Major asserts three defenses: first, that Orthopedic's interpretation of the agreement was not so communicated

---

2. Major's letter of termination to Xomed contained the following language:

> Due to a letter dated September 23, 1971 from Joe Spiro, sales manager of OEC, regarding representation of non-competing lines not authorized by OEC, I am resigning as an Xomed representative . . . . Since this directive from OEC specifically states their intention toward distributors who sell even non-competing products, I feel obligated to honor their request because I do not want to jeopardize my contract with OEC. [Letter dated September 24, 1971 from Major to Xomed Company.]

The Spiro letter referred to above contained the following provisions:

> This letter will serve as a review of OEC Bourbon's position relative to any involvement in sales activities with product lines and companies not authorized by the Home Office.

> 1. Under no circumstances will such relationships involving the representation of unauthorized product lines by distributors and their associates be tolerated.

> 2. Failure to comply with this regulation will result in the immediate termination of the individual or individuals involved in such undertakings.

> If we are all sincere in our efforts to once and for all establish OEC in its long overdue and rightful position in the marketplace, then compliance with this rule is essential. Such unauthorized side ventures only serve to distract our attention from accomplishing important tasks and objectives we have set for our company. [Letter of September 23, 1971 from Joseph D. Spiro to all distributors and associates of OEC.]

to him; second, that Orthopedic has reasons other than Major's violations of the agreement for wishing to terminate their business relationship; and third, that the interpretation given the agreement by Orthopedic should be strictly construed in light of federal antitrust policy.[3]

The evidence indicates, however, that Major ceased selling products as a sales representative of Xomed because he did not want to jeopardize his contract with Orthopedic.[4] Furthermore, Major was not representing any other companies in the hospital and medical field at the time this Court issued its temporary restraining order in May, 1972, throughout the pendency of this action, or at the time this action was settled and the Court issued its permanent injunction order. Major began representing other manufacturers subsequent to the date of the Court's permanent injunction, maintaining that he had the right to do so under the company's interpretation of the agreement. Such action is especially suspect in light of the Court's requirement that the parties "stick to what the situation was as of the time of the injunction unless you can agree to change it." Accordingly, the Court concludes that Major was cognizant of Orthopedic's view of the agreement, and may not contend that he acted in accordance with an oral modification of a substantially different nature than the one which Orthopedic advanced. Major, in contracting with Sorenson and Diffusion Sales to represent their product lines violated the agreement and the Court's injunction of May 13, 1973.

Major also contends that the true reason that Orthopedic seeks to "reverse its prior practice of allowing Major to sell other companies' products" is its desire for retribution for Major's institution of the initial action. The evidence fails to

sustain a conclusion that Orthopedic "reversed" its interpretation of the agreement so as to put Major in breach thereof. The evidence indicates a consistent uniform policy of Orthopedic to limit their distributors from acting as sales representatives of other product lines. Whether or not retribution is sought, Orthopedic has the right to demand that Major act in conformity with this Court's injunction of May 13, 1975, and the evidence sustains the proposition that Major has not so done.

The issue before the Court with respect to the commission schedule is whether Orthopedic should have paid Major under commission Schedule A or commission Schedule 4 from June 13, 1973 until December 31, 1974. When the contract between Major and Orthopedic was executed on September 15, 1969, Major was to be paid under the commission Schedule attached thereto,—commission Schedule A. In September, 1971 commission Schedule A was changed by reason of Orthopedic's then worsening financial condition, a change to which Major agreed on a temporary basis. At the time the Court entered its injunctive order of June 14, 1973, commission Schedule 4 was still in effect, and the parties were attempting to renegotiate the entire commission Schedule pursuant to the applicable provisions of the contract. However, subsequent negotiations resulted in the matter being disposed of by arbitration. It is clear that during the period in issue, Schedule 4 was the appropriate commission scale, for there was no evidence that the conditions causing Orthopedic to offer and Major to accept the reduced commission scale had, during the time in question, abated. Furthermore, this Court's order of June 14, 1973 indicated that commission Schedule 4 be continued in effect pending either a further order of the Court or future agree-

---

**3.** Orthopedic's interpretation of the agreement loosened the contract's express provisions prohibiting sales of non-company products in the hospital and medical field. The argument that the policy of the antitrust laws requires a fur-

ther relaxation of the agreement, never assented to by Orthopedic, has no basis or support in federal antitrust doctrines.

**4.** See footnote 2, *supra*.

ments between the parties. During the time in question, neither an order of the Court nor an agreement between the parties changed the commission scale, and the equities of the situation do not require a different conclusion.

 Finally, Major seeks attorney fees and costs to recover expenses incurred in connection with the successful assertion of his claim on May 25, 1973 that Orthopedic was in contempt of the Court's permanent injunctive order of February 21, 1973. The Court unquestionably has the power, in the exercise of sound discretion, to award a party aggrieved by the civil contempt of another party costs and attorney fees. *E. g., Sweetarts v. Sunline, Inc.*, 299 F.Supp. 572, 579 (E.D.Mo.1969), *rev'd in part on other grounds*, 436 F.2d 705 (8th Cir. 1971); *Backo v. Local 281 of the United Brotherhood of Carpenters and Joiners of America*, 308 F.Supp. 172, 179 (N.D.N. Y.1969), *aff'd*, 438 F.2d 176 (2d Cir. 1970). While there is much to be said about the uncooperative conduct of both parties, the violations addressed at the Court's hearing were fairly blatant ones, not hinging on difficult interpretation of the parties' agreement, and Orthopedic has not advanced sufficient ameliorating circumstances to justify their actions. Accordingly, Major should, taking into consideration, however, his own conduct in reference to the injunction of May 13, 1975, be partially reimbursed for his expenses incurred in protecting his rights under the Court's order of February 21, 1973.

An appropriate order will issue.